**Deborah ROBERTS, Plaintiff,**

v.

**GWINNETT COUNTY, GEORGIA, Defendant.**

**CIVIL ACTION NO.1:14–CV–1522–AT**

United States District Court, N.D. Georgia, Atlanta Division.

Signed August 31, 2016

---

John Franklin Beasley, Jr., JF Beasley, LLC, Watkinsville, GA, for Plaintiff.

Tuwanda Rush Williams, Duane D. Pritchett, Gwinnett County Department of Law, Lawrenceville, GA, David Alan Cole, Freeman Mathis & Gary, LLP, Atlanta, GA, for Defendant.

## ORDER

AMY TOTENBERG, UNITED STATES DISTRICT JUDGE.

This case presents a unique and complicated issue regarding liability under the Fair Labor Standards Act. Plaintiff Deborah Roberts is a retired evidence technician previously employed by the Gwinnett County Police Department. During her seven years with the police department, one of her job duties included providing court testimony at the behest of the District Attorney and Solicitor's offices regarding the integrity, preservation, transportation, and chain of custody of property and evidence logged and maintained by the police department. Since her retirement in 2012, she has received over 600 subpoenas for her testimony in criminal cases in which she handled evidence as part of her day-to-day duties as an evidence technician. Ms. Roberts has not been paid for her continued work, which she estimates consumed more than 300 hours. After her requests to Gwinnett County, the District Attorney, and the Solicitor to be relieved from this obligation went ignored, Ms. Roberts filed suit under the Fair Labor Standards Act seeking back pay, liquidated damages, attorneys' fees, and an injunction.

Deborah Roberts is stuck in a situation reminiscent of the famous concluding line of the Eagles' 1977 hit song *Hotel California*:

> Last thing I remember, I was running for the door I had to find the passage back to the place I was before "Relax," said the night man, "We are programmed to receive You can checkout any time you like, but you can never leave."

The parties filed cross-motions for summary judgment [Docs. 34, 37] on the issue of Gwinnett County's liability under the FLSA as Plaintiff's employer. The question before the Court is whether Plaintiff Deborah Roberts, as a retiree, is under the County's authority or control when she appears in court to testify pur-

suant to subpoenas issued by the District Attorney's ("D.A.") office or the Solicitor's office, which are separate and distinct entities from the County and serve the prosecutorial function of the State.

The Court's ruling is set forth below.

## I. FACTUAL SUMMARY [1]

Plaintiff was employed as an evidence technician by the Gwinnett County Police Department (the "Police Department" or "GCPD") from February 4, 2006 until her retirement on December 7, 2012. (Pl.'s Resp. Def.'s Stmt. Undisp. Facts ("Pl.'s Resp. SMF") ¶ 1; Def.'s Resp. Pl.'s Stmt Undisp. Facts ("Def.'s Resp. SMF") ¶ 40.) As an evidence technician, Plaintiff was assigned to the Property and Evidence Unit of the Police Department. (Pl.'s Resp. SMF ¶ 2; Def.'s Resp. SMF ¶ 2.) The GCPD Property and Evidence Unit is a component of the Support Operations Division of the Department, consisting of a Sergeant who serves as the "Property and Evidence Unit Supervisor," an "Evidence Technician Supervisor," an "Evidence Crime and Intelligence Analyst," and "Evidence Technicians." (Id.; Cobb Dep. Ex. 3.)

The job of an evidence technician is multi-faceted and defined in Gwinnett County's Standard Operating Procedure Manual as well as in a County General Directives Manual. (Def.'s Resp. Pl.'s Stmt. Undisp. Facts ("Def.'s Resp. SMF") ¶ 4.) Specifically, during her employment with the Police Department, Plaintiff's day-to-day duties as an evidence technician were answering phone calls, scheduling property release appointments with individuals, providing front counter customer service to police officers and citizens, retrieving evidence and property from police headquarters' lockers, logging evidence and property out to police officers, the District Attorney's Office, and the Solicitor's Office, preparing evidence and property for the GBI crime lab, and transporting evidence and property to and from the GBI crime lab and Gwinnett County police precincts. (Pl.'s Resp. SMF ¶ 3; Def.'s Resp. SMF ¶ 4.)

When evidence is brought into the Property and Evidence Unit from an officer or investigator, it is placed into an evidence locker along with a property sheet. (Pl.'s SMF ¶ 12; Cobb Dep. at 29.) The property sheet contains the case number, information about the location and chain of custody of the evidence, and the police department identification number ("PD number") for each evidence technician who handles the evidence. (Cobb Dep. at 28–30, 51; Pl.'s Resp. SMF ¶¶ 4–5.) The evidence technician documents the chain of custody of evidence or property on the property sheet each time the evidence is handled by the technician. (Pl.'s Resp. SMF ¶ 5.) An evidence technician enters the information from the property sheet into the department's records management system. (Pl.'s SMF ¶ 14; Cobb Dep. at 30–31.) The District Attorney's office has access to the information from the property sheets through a web query function of the Police Department's records management system. (Pl.'s SMF ¶¶ 16, 18; Cobb Dep. at 31–33.) The Solicitor's office obtains its information from the Evidence Unit by calling or emailing the Unit. (Cobb Dep. at 33.) The original property sheet is maintained in the evidence room of the Property and Evidence Unit, and copies are made available to the District Attorney's office and Solicitor's office as requested. (Pl.'s

---

1. The factual description here does not constitute actual findings of fact. The Court derives the facts below from the evidence in the rec-ord, and views these facts in the light most favorable to the non-moving party.

Resp. SMF ¶ 6; Ex. PX–9; Doc. 36–9 at 6.) The District Attorney's office and Solicitor's office regularly contact the Property and Evidence Unit to request both physical evidence and copies of the property sheets for use in prosecuting their cases. (Cobb Dep. at 69–70.) Communication from the District Attorney's office or Solicitor's office occurs on an almost daily basis. (Cobb Dep. at 35–36.)

As an evidence technician, Plaintiffs' job duties also included testifying in court regarding the integrity, preservation, transportation and chain of custody of property and evidence. (Def.'s Resp. SMF ¶ 4; Pl.'s Resp. SMF ¶ 8.) Evidence technicians are subject to annual performance evaluations based on their job duties, including court testimony. (Pl.'s SMF 43; Cobb Dep. at 112–114; Pl.'s Exs. 14, 15, 16, 17.) Evidence technicians receive in-house job training during the first 90 days of their employment. (Pl.'s SMF ¶ 5; Cobb Dep. at 58.) They also receive training for court testimony through observation and courses previously offered by the District Attorney's office. (Pl.'s SMF ¶ 6; Cobb Dep. at 104.)

The Police Department's Property and Evidence Manual provides a detailed description of the duties of evidence technicians, including two pages of information regarding court testimony and subpoenas. (Ex. PX–9; Doc. 36–9 at 6–7.) In addition to detailing other information, the Property and Evidence Manual provides the following description of an evidence technician's role in court testimony:

> We receive numerous subpoenas for court. Both superior court, which is the district attorney's office and state court, which is the solicitor's office.
>
> . . .
>
> The DA's office will call or e-mail you if they need you for a court case. Give

them your hours and your pager number for contact purposes.

> . . .
>
> When you testify, it will be for the chain of custody of an item.
>
> . . .
>
> Always let someone here know about court, especially if you must go first thing in the morning, and you go there straight from home.
>
> . . .
>
> Testifying in court can make you nervous. The attorney may go over your testimony however in the event they do not. [sic] Be truthful, and if you do not know the answer, say so. Most testimony will begin with "state your name," where. do you work, for how long? Job description: log in evidence that has been submitted to us. You may have to verify your writing on a bag, and that the bag is the original bag. Generally our testimony lasts about 2–5 minutes. If you receive a subpoena for juvenile court, contact the attorney and she will let you know if you need to show up. If you do go to juvenile court, be prepared to sit and wait for hours.
>
> On occasions, subpoenas will come from a defense attorney, recorders court or a probation officer, contact them as provided. It is a good idea to e-mail the prosecutor or investigator on the case so that they are aware of your subpoena. You must let your supervisor know about this per GDM, they in turn must contact the Chief's office.

(*Id.*)

As indicated in the Manual and in practice, evidence technicians receive subpoenas from the District Attorney's office and Solicitor's office to testify in court regarding the procedure for maintaining property or evidence; namely, that the evidence or property was sealed and documented

properly when they removed it from the overnight locker in the Evidence Unit. (Pl.'s Resp. SMF ¶ 8.) The Police Department has a "Court Liaison" who handles subpoenas for all Police Department employees, and he delivers subpoenas for evidence technicians to the Evidence Unit for distribution. (Pl.'s Resp. SMF ¶ 10.) Evidence technicians notify the Court Liason of any scheduling conflicts and leaves of absence on dates they have been subpoenaed for testimony. (Cobb Dep. at 40–41; Ex. PX–9; Doc. 36–9 at 7 ("Per the Court Liason: Make sure to complete Form# 249 and submit it to the court liason as soon as you have training or leave approved. Keep this in mind; you could still be compelled to court. If you have [a] subpoena that is in conflict with leave or training, e-mail the prosecutor and investigator in that division to advise them of our availability.").) According to the Evidence Technician Supervisor, Darlene Cobb, the Police Department Evidence Unit does not have a procedure in place to allow for evidence technicians to testify for each other when a conflict arose. (*Id.* at 108.) Instead, she understood such a procedure would be up to the District Attorney's office or the Solicitor's office to determine. (*Id.* at 109.) The District Attorney's office and the Solicitor's office would contact the evidence technicians directly through their individual County-issued email to discuss arrangements for court testimony. (*Id.* at 37–38; 86–87.)

While serving as an evidence technician Plaintiff Roberts would regularly receive subpoenas from the District Attorney's office and Solicitor's office for court appearances because her job included testifying in court on the integrity, preservation, transportation and chain of custody of property. (Def.'s Resp. SMF ¶ 42.) Plaintiff testified that although the frequency of court testimony varied (i.e. it was not a regular daily, weekly, or monthly occur-

rence) she received subpoenas on a weekly basis and "the process[ ] involved in court was a weekly procedure." (Roberts Dep. at 39–42.) Plaintiff estimates that she testified maybe once every three months during her seven years with the Police Department. (*Id.* at 41.) A number of the subpoenas she received both during her employment and later in retirement did not result in an actual court appearance. (*Id.* at 44–45.)

When testifying, the department requires that evidence technicians wear dress clothes or their issued Gwinnett County Police Department polo shirt and khaki pants. (Pl.'s SMF ¶ 35; Cobb Dep. 56; Ex. PX–9; Doc. 36–9 at 7 ("Attire: Since we do not have uniforms per se, you can wear your polo shirt with khaki, black (very dark) jeans or dress pants. You[r] other option is to wear dress clothing (slacks/shirt or dress) for your court appearance.").) On average, the testimony lasts five minutes, but can range anywhere from two to twenty two minutes. (*Id.*; Roberts Dep. at 82; Cobb Dep. at 66, 152; Ex. PX–9; Doc. 36–9 at 6 ("Generally our testimony lasts about 2–5 minutes.").) As hourly employees, if called to testify outside of normal business hours, technicians are entitled to submit requests for overtime pay both for their travel time and time attending court. (Pl.'s SMF 36; Cobb Dep. 70–71, 106–107; Ex. PX–9; Doc. 36–9 at 6 ("When you do go to court, it will be generally during the day. If you work nights and are required to go to court, you will need to fill out overtime sheet for court and indicate on it the case you had to be there for … Document your travel time, so that you can receive your monies for it.").) When Plaintiff had to appear in court after hours, she was allowed to submit requests for overtime and did so. (Def.'s Resp. SMF 44.)

Beginning in January 2013, following her retirement from the Gwinnett County Police Department in December 2012, Plaintiff began receiving subpoenas directly from the District Attorney's Office and the Solicitor's Office for her to appear in court to testify as to chain of custody matters. (Pl.'s Resp. SMF ¶ 11.) Since her retirement from the Police Department, Plaintiff does not receive subpoenas from the Police Department's court liaison, and no one else from the Police Department has issued her a subpoena. (Pl.'s Resp. SMF ¶ 12.) Nor has Plaintiff contacted or been contacted by anyone in the Police Department or the Evidence Unit about subpoenas or testifying in court proceedings. (Id.; Pl.'s Resp. SMF ¶.17.)

Darlene Cobb is the supervisor of evidence technicians employed by the Police Department, and she was Plaintiff's immediate supervisor throughout Plaintiff's last year of employment with the department. (Pl.'s Resp. SMF ¶ 15.) Since her retirement from the Police Department, Plaintiff does not contact Ms. Cobb when she receives a subpoena from the District Attorney's Office or the Solicitor's Office. (Pl.'s Resp. SMF ¶ 16.) Plaintiff's understanding is that the chain of communication requires her to contact the court (i.e. the DA or the solicitor's offices) regarding subpoenas for court testimony now that she is retired. (Id.; Roberts Dep. at 54–55.) According to Darlene Cobb, she has no knowledge of when Plaintiff receives a subpoena to testify in court. (Cobb Dep. at 150.)

Darlene Cobb, was nonetheless aware that Plaintiff had been subpoenaed by the District Attorney's office for testimony after her retirement. (Cobb Dep. at 76–77, 188.) In the first month or so following Plaintiff's retirement in December, Cobb was contacted by the District Attorney and Solicitor's offices looking for Plaintiff Rob-

erts and Darlene Cobb would "say you have to go through HR because she is retired, and that is where the subpoenas need to go back through, the court liason or whatever process they have to contact her." (Cobb Dep. at 77–78.) Darlene Cobb has had similar lines of communication with the District Attorney and Solicitor's offices regarding other formerly employed evidence technicians:

And that happened I think even with Pam Cain, after she left. Jennifer Leith, sometimes hers come to us, and we send them back over to crime analysis, where she is at now, because it takes a little bit, about a month or so, for them to get on board with they are no longer with us and they are somewhere else.

. . .

Q. You believe that you may have had communication with the district attorney or the solicitor's office to inform them, look, they are no longer here, you need to go through HR or whatever?

A. That's correct.

Q. Is that something that you have had to do for other employees of the evidence unit that have left?

A. Yes. I believe like Orlando Flores transferred to code enforcement. His subpoenas would come to us, we would send them over. Or if they called and asked if Orlando is available, we would say you need to speak with him directly, he is with code enforcement now and I don't know his schedule, so . . .

(Id.; see also Cobb Dep. at 54–55 (detailing communications with DA's office regarding passing on contact information for evidence technicians who left the department).) Ms. Cobb is also aware that other former evidence technicians have received subpoenas to testify in court after they retire or have left the Police Department. (Cobb Dep. at 150.)

According to Ms. Cobb, the Police Department Evidence Unit did not have a procedure in place to allow for actively employed evidence technicians to testify for formerly employed evidence technicians. (*Id.* at 147–48.) But, there have been occasions when one evidence technician would testify in the place of another evidence technician who had left the unit (or was otherwise unavailable) as to the procedures used to document chain of custody. (Cobb Dep. at 44–46.) Ms. Cobb stated that she has never received a formal request in advance by the D.A. or Solicitor to testify for another evidence technician who is no longer available. (Cobb Dep. at 49–50.) Instead, Darlene Cobb has provided this type of testimony while already on the stand testifying about her own handling of evidence in the case, and she was asked questions about the procedures used by another evidence technician (Cindy Pharr) referenced on the property sheet but who was no longer employed with the Police Department. (*Id.*) Ms. Cobb was aware of that same process being followed by the attorneys with respect to at least one other evidence technician in her unit. (*Id.* at 50 (discussing instance where Jennifer Leith testified in case as to procedures followed by Cindy Pharr).) Plaintiff Roberts herself provided testimony in place of evidence technicians who had left the department prior to her retirement. (Roberts Dep. at 142–45.)

Each evidence technician in the Property and Evidence Unit is assigned a police department number ("PD number") that is associated with records management and is used to identify the technician handling the evidence on the property sheets. (Cobb Dep. at 51.) Ms. Cobb provides the DA's office with a list of the evidence technicians and their PD numbers. (*Id.* at 51–52.) Ms. Cobb updates the list when evidence technicians leave the department and new ones join. (*Id.* at 51–53.) If a PD number is not listed because the technician left or retired, the District Attorney's office would contact the Unit for more information. (Pl.'s SMF 31; Cobb Dep. at 54.)

As a retired employee, Plaintiff has no access to the evidence/property room, the original property sheets, or the County's computers, nor has she requested access since her retirement. (Pl.'s Resp. SMF ¶¶ 7, 18–19.) Instead, when she is called to court, someone from either the District Attorney's Office or the Solicitor's Office, and not the County, will provide her with a copy of the property sheet that is needed for her testimony concerning chain of custody matters. (Pl.'s Resp. SMF ¶ 18.)

According to the Evidence Technician Supervisor Darlene Cobb, technicians are subject to subpoena for testimony for so long as there is a case involving any property that they may have handled and that it is understood that this obligation continues even after the technician has left the department and/or retired. (Pl.'s SMF ¶¶ 37–38; Cobb Dep. at 80–81.) Plaintiff Roberts, however, testified that it was her expectation that her job duties would cease upon retirement. (Pl.'s SMF ¶ 46; Roberts Dep. at 55.) As Ms. Cobb acknowledged, failure to appear for a subpoena is punishable by "penalty of law," which can include a fine or jail time. (Cobb Dep. at 67–68.)

Since her retirement from the Police Department on December 7, 2012, Plaintiff has not performed any of the job duties of an evidence technician other than providing court testimony in response to the subpoenas issued by the District Attorney's office and the Solicitor's office. (Pl.'s Resp. SMF ¶ 3, 7, 13.) Following her retirement from the County, Ms. Roberts has received a "Civilian Employee—Retired" badge. (Pl.'s SMF ¶ 47; Roberts Decl. ¶ 8, Ex. A to Roberts Decl., Doc. 34–5.) She has been served with at least 614

subpoenas, has logged 312.8 hours of work time in response to the subpoenas, 3,913 hours on call, and has testified in court at least 15 times. (Pl.'s SMF ¶ 47; Roberts Decl. ¶ 9; Pl.'s Resp. Interrogatory No. 14.)

When Ms. Roberts receives a subpoena, she opens a file, calendars the report date and time and logs in the case, all of which takes approximately 15 minutes. (Roberts Dep. at 66.) She communicates with the attorneys in the DA and Solicitor's offices in an attempt to determine the likelihood of being called to court. (*Id.* at 84–86.) Otherwise, she does not find out whether she will in fact be called to testify until the week before the anticipated court date. (*Id.* at 75.) When Ms. Roberts receives a subpoena, she must remain on call for the duration of the calendar, which requires her to remain close to her house and presentable for court. (Pl.'s SMF 60; Roberts Dep. at 92.) She has been directed by persons from the District Attorney's office to cancel plans and appointments, including doctor's appointments. (Roberts Dep. at 88.) She cannot travel anywhere outside a 30–minute or hour reporting time and her free time is limited, taking into consideration the possibility of being called away to court. (Pl.'s SMF 61; Roberts Dep. at 93.) Once called to court, she may only testify for ten minutes but there have been occasions where Ms. Roberts has had to wait an entire day to testify. (Roberts Dep. at 96, 115.) Ms. Roberts has turned down several opportunities for employment due to the unpredictability of her schedule. (Pl.'s SMF 64; Roberts Dep. at 99–102.) With the exception of a single $25.00 payment for a witness fee, Ms. Roberts has not been compensated for any of her time associated with providing testimony since her retirement. (Ex. 5 to Roberts Dep., Doc. 35–5; Roberts Decl. ¶ 10.)

In February 2013, Ms. Roberts wrote to the D.A. and Solicitor notifying them of the problem and requesting their assistance. (Roberts Decl. ¶ 11; Exs. C, D to Roberts Decl.) She received no response. (*Id.* ) A year later, she wrote to her County Commissioner explaining and again received no response. (Roberts Decl. ¶ 12; Ex. E to Roberts Decl.) After visiting the Commissioner's office and asking to speak with him in person, Roberts received a call from his secretary advising her that she could file a lawsuit. (Roberts Decl. ¶ 13.)

## II. STANDARD OF REVIEW

The Court may grant summary judgment only if the record shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is material if resolving the factual issue might change the suit's outcome under the governing law. *Id.* The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party. *Id.* at 249, 106 S.Ct. 2505.

When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). If the moving party meets this initial burden, in order to survive summary judgment, the non-moving party must then present competent evidence beyond the pleadings to show that there is a genuine issue for trial. *Id.* at 324–26, 106 S.Ct. 2548. The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## III. ANALYSIS

 Plaintiff's suit asserts a claim against Gwinnett County for its alleged violation of the FLSA's minimum wage requirement by failing to pay her any wages for continuing to perform a certain aspect of her job as an Evidence Technician. Plaintiff and the County each seek summary judgment in their favor on the issue of the County's liability under the FLSA as Plaintiff's employer. Plaintiff asserts that the requirement that she continue performing her pre-retirement job responsibility of providing court testimony in support of the integrity, preservation, transportation, and chain of custody of property and evidence with no pay is a form of modern day involuntary servitude. She seeks to hold Gwinnett County, her former employer, liable for payment of at least a minimum wage for all hours she has devoted to that responsibility since her retirement. Plaintiff acknowledges that she continues to provide testimony at the bequest of the District Attorney and Solicitor's office through subpoena, but argues that Gwinnett County permitted this work and gained a benefit from Plaintiff's testimony as to the proper performance of its custodial obligation to catalogue, preserve and maintain evidence. She further asserts that because Gwinnett County was aware of her work and purposefully ignored its

obligations, its FLSA violation was willful and demands an award of liquidated damages. Finally, Plaintiff argues that Gwinnett County is at least a joint employer subject to liability for payment of wages under the FLSA.

On the flip side, Gwinnett County contends that, as a retiree, Plaintiff is not under the authority or control of the County when she receives subpoenas from the District Attorney's Office and the Solicitor's Office or when she appears in court to testify as to chain of custody matters. According to its Motion, the County is not even aware of when Plaintiff receives subpoenas from the D.A. or the Solicitor and therefore cannot compel Plaintiff to appear in court to testify. Gwinnett County further argues that the County is not a joint employer because the District Attorney's Office and the Solicitor's Office are separate and distinct entities from the County and any work performed by Plaintiff pursuant to those subpoenas is for the benefit of the State's prosecutorial function rather than on behalf of or in furtherance of the duties of the County. Finally, Gwinnett County asks this Court to reconsider Defendant's prior argument (rejected at the motion to dismiss stage) that retired employees are not employees under the FLSA entitled to payment of minimum wages.

There currently exists no legal test to determine employment status under the FLSA that fits the precise facts of this case. The Court therefore embarks on its obligation here to explore the strange factual circumstances of this case.

 Congress enacted the FLSA to "guarantee either regular or overtime compensation for all actual work or employment." *Dade County, Fla. v. Alvarez*, 124 F.3d 1380, 1384 (11th Cir. 1997) (quoting *Tennessee Coal, Iron & R. Co. v. Mus-*

*coda Local No. 123*, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944)). The minimum wage and overtime protections afforded by the FLSA extend only to individuals falling within the Act's definition of "employee." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1207 (11th Cir. 2015); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). Eleventh Circuit Judge Robin Rosenbaum recently quipped that "[t]he tricky part arises in determining who falls within the FLSA's definition," because as it relates to who qualifies as an employee, the FLSA's definitions "are not precise." *Id.* at 1207 (citing *Glatt v. Fox Searchlight Pictures, Inc.*, 791 F.3d 376, 381 (2d Cir. 2015) ("The FLSA unhelpfully defines 'employee' ....."); *Marshall v. Regis Educ. Corp.*, 666 F.2d 1324, 1326 (10th Cir. 1981) (describing FLSA's definitions of "employee" and "employ" as "circular and all inclusive") (quoting *Marshall v. Regis Educ. Corp.*, 1980 WL 2201, at *2 (D. Colo. May 29, 1980)); *Solis v. Laurelbrook Sanitarium and Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (describing the FLSA's definitions of "employee," "employer," and "employ" as "exceedingly broad and generally unhelpful"); *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994) (describing the FLSA's definitions of "employee," "employer," "employ," and other terms as "so unhelpful")).

As described by the Eleventh Circuit, "employee" is "a term given rough outline by a series of broad definitions in the Act:"

An "employee" is "any individual employed by an employer." [29 U.S.C.] § 203(e)(1). An "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). The term "employ" "includes to suffer or permit to work." *Id.* § 203(g).

*Scantland*, 721 F.3d at 1311. The "striking breadth" of the FLSA's definition of "employ" has been noted as "stretch[ing] the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (discussing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)); *Scantland*, 721 F.3d at 1311 (noting that the FLSA's definitions of employment "are intended to be comprehensive enough to include 'working relationships, which prior to this Act, were not deemed to fall within an employer-employee category") (internal quotations omitted).

The Supreme Court and the Eleventh Circuit have cautioned that the determination of whether an individual is a covered "employee" shall "not [be] governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'" *Scantland*, 721 F.3d at 1311 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528, 70 S.Ct. 755, 94 L.Ed. 1017 (1950) ("Our decisions have made one thing clear about the Fair Labor Standards Act: its applicability is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes.").) Thus, in denying Gwinnett County's earlier Motion to Dismiss, this Court previously stated:

while the FLSA's expansive definition of "employee" "is not so broad as to include those 'who, without any express or implied compensation agreement, might work for their own advantage on the premises of another,' ... where the work done, in its essence, follows the

usual path of an employee," characterizing the worker as retired does not automatically deprive her of the protection of the FLSA when she is "suffered" to work for the benefit of another. *See Rutherford Food Corp.*, 331 U.S. at 728–29 [67 S.Ct. 1473] (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 [67 S.Ct. 639, 91 L.Ed. 809] (1947)); *see also Truslow v. Spotsylvania County Sheriff*, 783 F.Supp. 274 (E.D. Va. 1992) (finding that deputy sheriff voluntarily assigned to a canine unit was entitled to compensation for off-duty care of his police dog and related activities under the FLSA because the dog-related duties were (1) "plainly an integral and indispensable part of his principal activities as a deputy sheriff in the canine units," and (2) were "performed primarily for the benefit of defendants, who would otherwise have had to make alternate arrangements for the dogs' boarding and care").

(Doc. 22, Order Denying Motion to Dismiss at 6.) Simply labeling Ms. Roberts as a "retiree [2]" and arguing that, as such, she "is no longer an employee of the County and is therefore not entitled to earn wages from the County under the FLSA" does not suffice. (*See* Def.'s Mot. Summ. J. at 17–18.)

■ A determination of employment status under the FLSA is a question of law.[3] *E.g. Scantland*, 721 F.3d at 1311. Because it is so "tricky" and the text of the statute is so "unhelpful," courts have taken to crafting multi-factor tests to determine who is and who is not an employee. *See id.* (applying 6–factor "economic reality" test to determine whether an individual falls into the category of covered employee or exempted independent contractor); *Schumann*, 803 F.3d at 1209–1212 (discussing Second Circuit's 7–part "primary beneficiary" test for determining whether interns are covered employees). Although the issue is ultimately one of law, "[i]n entertaining and assessing the evidence with respect to a factor, the court is, in effect, conducting a miniature bench trial." *Martinez–Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 n. 27 (11th Cir. 2003). While "[i]t is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist." *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 808 (11th Cir. 1992); *Alvarez*, 124 F.3d at 1383.

■ One of the primary tests employed by the courts to determine whether someone is a covered employee under the FLSA is the "economic reality test." *See Bartels v. Birmingham*, 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 1947 ("[E]mployees are those who as a matter of economic reality are dependent upon the business to which they render service"); *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (referencing " 'economic reality' rather than 'technical concepts' " as the "test of employment"); *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 301, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) ("The test of employ-

---

**2.** This Court already determined that the Supreme Court's decision in *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), construing the meaning of the term "employee" in the National Labor Relations Act and restricting the scope of a union's authority to act as the binding bargaining agent of "retirees," does not control the issue before this Court. (*Id.* at 7–8.)

**3.** So is the question of whether a particular set of facts and circumstances constitutes work under the FLSA. *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 807 (11th Cir. 1992).

ment under the Act is one of 'economic reality'[.]"); *Aimable v. Long & Scott Farms, Inc.*, 20 F.3d 434, 439 (11th Cir. 1994) ("To determine whether an employer/employee relationship exists for purposes of federal welfare legislation, we look ... to the 'economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer."); *Scantland v. Jeffry Knight, Inc.*, 721 F.3d at 1311 ("To determine whether an individual falls into the category of covered 'employee' or exempted 'independent contractor,' courts look to the "economic reality" of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence.") (citing cases). "The touchstone of the economic reality test is the alleged employee's economic dependence on the employer." *Freeman v. Key Largo Volunteer Fire and Rescue Dept., Inc.*, 494 Fed.Appx. 940, 942 (11th Cir. 2012); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976) ("[T]he final and determinative question must be whether ... the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit.")

But "stat[ing] that economic realities govern is no more helpful than attempting to determine employment status by reference directly to the FLSA's definitions themselves." *Schumann*, 803 F.3d at 1210, n. 8 (citing *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522–23 (6th Cir. 2011)). And the federal courts have repeatedly recognized that there is no one-size-fits-all approach to analyzing employment status under the Act. *See Aimable v. Long and Scott Farms*, 20 F.3d 434, 440, 444 (11th Cir. 1994) (discussing eleven factors advocated by employer to be considered as probative of economic dependency

and finding that "not all ... eleven factors should be given equal weight and, indeed, several of them are of no value insofar as they apply to factual circumstances not here present ... [and] our inquiry permissibly may be limited to probative factors"); *Scantland*, 721 F.3d at 1312 (noting that the various tests used by the courts are only aids and the factors serve as guides); *Solis*, 642 F.3d at 522 ("The issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity.") (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)). Many courts apply the statutory and regulatory definitions "in a common-sense manner" taking into account "the totality of the circumstances surrounding the relationship between the individual providing services and the entity for which the services are provided." *Doyle v. City of New York*, 91 F.Supp.3d 480, 484 (S.D. N.Y. 2015) (citing *Purdham v. Fairfax Cnty. Sch. Bd.*, 637 F.3d 421, 428 (4th Cir. 2011) (citing *Cleveland v. City of Elmendorf*, 388 F.3d 522, 528 (5th Cir. 2004))). Recently, in *Schumann*, the Eleventh Circuit endorsed the Second Circuit's approach in treating "employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of circumstances," and applying a "set of non-exhaustive factors" to determine employment status. 803 F.3d at 1211–1212; *see also Brown v. New York City Dept. of Educ.*, 755 F.3d 154, 167 (2d Cir. 2014) (making clear that there is no "single 'economic realities' test consisting of uniform factors" to be applied in every case; instead, the economic realities must be "assessed by reference to the particular situation with some factors more important than others depending on the FLSA question at issue and the context in which it

arises"); *Doyle*, 91 F.Supp.3d at 486–87 (noting that "the Second Circuit has found that, in certain contexts, application of a multi-factor test can cause a court to miss the forest for the trees and that, in those cases, the economic reality test must be applied at 'a higher level of generality,' with attention to whether the case involves the kind of employment relationship Congress had in mind when it enacted the FLSA").

Gwinnett County itself acknowledges "the difficulty with applying the economic reality factors [ ] 'is that they largely arise from cases involving alleged independent contractors," but offers no alternative analysis. Practically speaking, because of her retired status Plaintiff does not receive any compensation from Gwinnett County and is thus not economically dependent on the County. For these reasons, this Court previously found that "[t]hese economic reality tests are of limited assistance in this case where the relevant question is whether a retired employee who is compelled to provide her services after her formal employment has ended is entitled to compensation under the FLSA." (Order on Mot. to Dismiss, Doc. 22 at 8–9.) Courts have analyzed whether volunteers, student interns, trainees, prisoners, and whether someone who performs community service as a condition of the dismissal of criminal charges qualify as "employees" for purposes of the FLSA. It does not appear that courts (and certainly not the Supreme Court or the Eleventh Circuit) have analyzed whether retired law enforcement officers who regularly provided court testimony as part of their job duties are subpoenaed to provide such testimony after retirement are employees subject to the FLSA's minimum wage and overtime requirements. Thus, there is no predetermined test to aid this Court under the unusual circumstances of this case, even where many of the facts are not disputed.

■ Gwinnett County nevertheless argues that this Court should apply the economic reality test factors to hold, as a matter of law, that Ms. Roberts is not a covered employee of the County under the FLSA entitled to compensation for her court testimony. These factors include whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records; and additional considerations such as (5) the nature and degree of the alleged employer's [4] control as to the manner in which the work is to be performed, (6) the alleged employee's opportunity for profit or loss depending upon his managerial skill, (7) the alleged employee's investment in equipment or materials required for his task, or his employment of workers, (8) whether the service rendered requires a special skill, (9) the degree of permanency and duration of the working relationship, and (10) the extent to which the service rendered is an integral part of the alleged employer's business. (Mot. at 13) (citing *Scantland*, 721 F.3d at 1312); *see also Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997) (citing *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)). Gwinnett County concedes that a number of these factors are inapplicable here—namely the alleged employee's opportunity for profit or loss, the alleged employee's investment in equipment or materials required for his task, whether the service

---

4. In its motion, Gwinnett County mistakenly referred to the employee as opposed to the employer.

rendered requires a special skill, and the degree of permanency and duration of the working relationship. (Def.'s Mot. at 16.)

While Plaintiff argues that the economic reality test is "cumbersome and much too narrow" and advocates for a "reasonableness approach based on the totality of the circumstances" for the purpose of deciding this case, she simultaneously contends that the application of a number of its factors results in a finding in her favor. (See Pl's Mot. at 8–14; Pl.'s Resp. at 7–15.) Specifically, Plaintiff asserts that the following factors support the employment relationship: (a) the extent to which the service rendered is an integral part of the alleged employer's business, (b) the degree of permanency and duration of the working relationship, and (c) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed. (See id. )

Gwinnett County's motion focuses on the fact that the vehicle through which Ms. Roberts is compelled to provide her services—the subpoenas—are issued by the District Attorney and Solicitor's offices and not the County. As a result, Gwinnett County argues that the evidence in the case establishes that since her retirement, the County (a) has no control over Plaintiff for purposes of her compliance with subpoenas from the District Attorney's Office and the Solicitor's Office, (b) has no authority to hire or fire Plaintiff, (c) does not supervise or control Plaintiff's work schedule or conditions of employment, (d) has no control over how many subpoenas Plaintiff receives, how much time she spends reviewing them, or how much time she spends preparing to testify, (e) does not exercise control over the manner in which Plaintiff testifies pursuant to subpoenas that she receives from the District Attorney's Office and the Solicitor's Office or whether Plaintiff even shows up for court

to testify. (Mot. at 14–15.) Gwinnett County also argues that there is no evidence that the County has the authority to determine any rate or method of payment to Plaintiff in exchange for work that she performs pursuant to subpoenas she receives from the D.A and the Solicitor or that the County maintains employment records of Plaintiff's time spent reviewing subpoenas and testifying (because the County does not know when Plaintiff receives a subpoena to testify in court). Finally, Gwinnett County asserts that the court testimony Ms. Roberts has given since her retirement is not an integral part of the County's business because (1) providing court testimony regarding the chain of custody of evidence or property is only one of multiple duties of an evidence technician, and it is not a day-to-day duty, and (2) Plaintiff admits that reviewing subpoenas and testifying in court is the only job function of an evidence technician that she has performed since her retirement in December 2012.

Each of Gwinnett County's arguments is based entirely on the temporal delineation of Ms. Roberts' work—before and after her retirement—and ignores the reality (whether economic or practical) that the nature of the work itself is the same. Or as Plaintiff puts it, Gwinnett County "filters its analysis through the lens of Ms. Roberts' retirement, virtually discounting the past employment relationship upon which her current work is based." (Pl.'s Reply at 1–2.) Such a view, Plaintiff contends, results in a skewed picture of liability. In other words, it ignores that Plaintiff spends hundreds of hours testifying or waiting to testify about chain of custody matters only because of her prior employment relationship with Gwinnett County.

For example, Gwinnett County does not contend that **prior** to her retirement it had no control over Plaintiff's work schedule,

conditions of employment, compliance with subpoenas from the D.A. and the Solicitor, or the manner in which Plaintiff testifies pursuant to the subpoenas or that it did not maintain employment records of Plaintiff's time spent reviewing subpoenas and testifying. Such contentions would be easily debunked by the evidence in the record that the GCPD evidence technicians were (a) required to provide court testimony pursuant to such subpoenas as outlined in the Property and Evidence Manual, (b) required to coordinate with a GCPD Court Liason and the attorney's themselves regarding scheduling conflicts with court dates, (c) required to notify the Property and Evidence Unit personnel when they were called to court, (d) required to wear specified attire when testifying in court, (e) advised via observation, training, and the Manual on the requisite components of their testimony, (f) permitted to submit for overtime pay for travel time to and from the courthouse and for testimony provided during their off-duty hours, and (g) evaluated annually on the performance of all their job duties, including court testimony. (*See* PX–13; PX–14.)

 Gwinnett County's arguments demonstrate why a flexible approach to determining employment status, as authorized by the Eleventh Circuit in *Schumann*, *Scantland*, and *Aimable*, is appropriate in this case. The principal focus of the Court's analysis must be on whether "the work done, in its essence, follows the usual path of an employee" such that an individual would be deemed an employee for purposes of the FLSA. *Scantland*, 721 F.3d at 1311 (quoting *Rutherford Food Corp. v.*

*McComb*, 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947)). Under this approach, only two of the economic reality test factors are materially relevant to the Court's analysis of whether Plaintiff, a "retired" employee, is suffered or permitted to work without compensation by Gwinnett County when she is called to provide testimony by the D.A. or Solicitors' office: (1) the extent to which chain of custody testimony is an integral part of the GCPD Property and Evidence Unit's operations; and (2) the nature and degree of Gwinnett County' control as to the manner in which Plaintiff provides her subpoenaed testimony. "In addition to the 'economic reality' of the situation, other factors to consider include whether there was an expectation or contemplation of compensation, whether the employer received an immediate advantage from any work done by the individual, the relationship of the parties, and the goals of the FLSA." *Okoro v. Pyramid 4 Aegis*, 2012 WL 1410025, *9 (E.D. Wis. 2012) (addressing whether the plaintiff performed work as an employee or on a voluntary basis without any expectation of being paid and citing *Alamo Found.*, 471 U.S. at 300–01, 105 S.Ct. 1953 and *Rutherford*, 331 U.S. at 730, 67 S.Ct. 1473.)[5]

Contrary to Gwinnett County's assertion, "work can be integral to a business even if the work is just one component of the business." Administrator's Interpretation No. 2015–1, U.S. Dep't of Labor, Wage and Hour Division, *The Application of the Fair Labor Standards Act's "Suffer or Permit" Standard in the Identification of Employees Who Are Misclassified as Independent Contractors*. In addition to

---

5. In its prior order on Gwinnett County's Motion to dismiss, the Court noted that the decision in *Okoro* is helpful to the Court's analysis here although it does not directly address the employment status of a retiree. There, the court looked at the totality of the circumstances, in addition to the economic reality, and found that "allowing Aegis the benefit of Okoro's free labor when there existed an expectation of compensation would not comport with the FLSA's purpose." 2012 WL 1410025 at *10 (citing *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944)).

the evidence recited above that court testimony was a regular and required job duty of evidence technicians, the GCPD also employs very specific and strict protocols on how the evidence technicians carry out their job duties of receiving and storing evidence collected by the officers, completing and maintaining the paperwork detailing the chain of custody (property sheets), and handling and releasing of evidence, among others. (*See* PX–13.) From this, it is not difficult to conclude that court testimony by evidence technicians regarding the procedures used by them daily in ensuring the integrity, preservation, and chain of custody of evidence is an integral function of the job and the operation of the Property and Evidence Unit as a whole.

■ The extent to which work is authorized, controlled, or effectively suffered or permitted by an employer is a relevant factor for analyzing liability pursuant to the FLSA, not only under the economic reality test but a variety of other FLSA contexts. *See Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir. 1996) (considering agricultural joint employment relationship between growers, pickers, and labor contractor and stating "the 'suffer or permit to work' standard was developed to assign responsibility to businesses that did not directly supervise putative employees ... the suffer or permit to work/economic dependence standard defines employment in a way that does not depend on the common-law understanding of employment, which was based on limiting concepts of control. [ ] Nevertheless, a grower's control of farmworkers does shed some light on economic dependence."); *Aimable*, 20 F.3d at 440–442 (analyzing "specific indicia of control" of farm labor contractor and finding, in part, that because all direct supervision of the workers was performed by the contractor, who also had the sole power to hire or fire the harvest workers and exercised absolute, unfettered, and sole control over the workers and their employment, the workers were not jointly employed by growers); *Alvarez*, 124 F.3d at 1384 (determining whether off-duty employment-related activities are compensable under the FLSA and noting "[g]enerally, courts have construed work to mean all activities 'controlled or required by the employer and pursued necessarily and primarily for the benefit of his employer and his business'"); *Birdwell*, 970 F.2d at 807 (considering whether police officers' on-call time is compensable and noting that the "question of whether the employees are working during this time for purposes of the FLSA depends on the degree to which the employee may use the time for personal activities ... whether the time is spent predominately for the employer's benefit or the employees'" and finding that "an employee's free time must be severely restricted for off-time to be construed as work time for purposes of the FLSA"); *see also* 29 C.F.R. § 785.13 ("In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.")

Gwinnett County's arguments related to its lack of authority or control over Ms. Roberts hinge on her technical status as retired from the police department, discounting entirely the reason for her continuing "obligation" to provide testimony—her past performance of all of her daily job duties as an evidence technician. In light of the totality of the circumstances of the parties' working relationship, Gwinnett County's position, crafted in an attempt to disavow its potential continuing obligations, is disingenuous. The undisputed

evidence in the record demonstrates that GCPD controls a substantial part of the operations that underlie and culminate in the testimony of evidence technicians subpoenaed by the DA or Solicitor.[6] Obviously, the GCPD also has some level of control over the testimonial aspects of the job of its current evidence technicians in conjunction with the prosecuting attorneys as briefly summarized above.

Construed in Plaintiff's favor, the record indicates the following. GCPD is aware that individuals formerly employed by the department as evidence technicians are compelled, via subpoena, to continue providing court testimony regarding the integrity, preservation, transportation, and chain of custody of property and evidence after they have left the Police Department. Darlene Cobb, the Evidence Technician Supervisor would receive calls from the D.A. or the Solicitor's offices regarding the availability or whereabouts of certain evidence technicians and advised the attorneys how to locate them and where to serve their subpoenas. Although Defendant contends in its response to Plaintiff's motion that it is not aware of when Plaintiff is subpoenaed to testify in court, GCPD is aware that Plaintiff is being called to perform this duty while retired, as other formerly employed technicians have done for the benefit of the department. Whether or not GCPD was on notice of each subpoena issued, the Police Department was aware and understood that its former evidence technicians were being called regularly to provide this function that would otherwise be executed by the GCPD. Through her court testimony,

Plaintiff continues to perform an essential job function of an evidence technician. Gwinnett County derived a benefit of Plaintiff's performance of that duty prior to her retirement and continues to do so now. There is no logical reason or evidence in the record as to why Gwinnett County could not pay Plaintiff for work now performed without compensation.

Plaintiff argues that while she "has no ability to control when or how often she is called to court, the County has at least some ability to regulate testimony by assignment of other evidence technicians as substitutes" as a result of her retirement status. (Pl.'s Reply at 9.) But the actual evidence before the Court on the current motions is surprisingly slim in this regard, although CGPD would be authorized by law to assign other technicians to testify as to evidence chain of custody. *See Ashley v. State*, 316 Ga.App. 28, 728 S.E.2d 706, 709 (2012) ("Where the State seeks to introduce evidence of a fungible nature, it must show a chain of custody adequate to preserve the identity of the evidence. The burden is on the State to show with reasonable certainty that the evidence is the same as that seized and that there has been no tampering or substitution. The State need . . . only establish reasonable assurance of the identity of the evidence . . . The lack of testimony by a crime lab employee who originally receives drugs does not, in all circumstances, break the chain of custody.") The only testimony in the record is that of Plaintiff Roberts and her former immediate supervisor, Darlene Cobb, the Evidence Technician Supervisor.[7] While Plaintiff testified in her deposi-

---

**6.** Plaintiff argues that to the extent Gwinnett County claims it is not her employer because it is not responsible for the subpoenas she receives from the D.A. or Solicitor, the County is at least a joint employer insofar as court testimony is concerned. However, because there is evidence from which a jury could find

Gwinnett County liable on its own, it is unnecessary to determine whether the D.A. and Solicitor are joint employers of GCPD evidence technicians under the FLSA.

**7.** Plaintiff also offered a declaration from another former evidence technician, Pam Cain. However, Ms. Cain's testimony on this issue

tion that she had provided court testimony on behalf of other technicians who were either out on leave or no longer with the department, she did not specify that she did so pursuant to a directive from anyone within her unit or pursuant to an official GCPD policy. In her declaration, Plaintiff stated that when she was called upon to testify for another technician it was arranged by her supervisor Darlene Cobb and coordinated with the D.A.'s office. (Roberts Decl. ¶ 7.) Like Plaintiff, Darlene Cobb also indicated in her deposition that she too had testified in place of other absentee evidence technicians. But according to Ms. Cobb, there is no GCPD policy or procedure in place whereby the department designates current evidence technicians to testify in place of former employees. Instead, she indicated it would be up to the DA or Solicitor's office to implement such a procedure. In Ms. Cobb's situation, she provided this "substitute" testimony only upon being questioned while already present on the witness stand to offer testimony regarding her own handling of the evidence in the same case. There is a dispute in the testimony regarding whether the GCPD in fact arranged for evidence technicians to testify on behalf of one another in coordination with the D.A. and Solicitor's office. The record indicates that a mechanism does in fact exist for addressing the problem Ms. Roberts faces. The question remains—is it Gwinnett County's problem?

It would appear that Gwinnett County should have the ability to deal with what is, from the record, a recurring problem within the Police Department and develop a policy in coordination with the DA and Solicitor's office. However, there is no testimony from the Sergeant in charge of the Property and Evidence Unit, the District Attorney, or the Solicitor regarding the

extent of coordination between these entities on what is clearly an important function of the GCPD's evidence technicians in providing testimony in association with the prosecution of crimes committed in the jurisdiction of Gwinnett County. Thus, there is an insufficient basis in the record for the Court to determine, as a matter of law or evidence, the level of control Gwinnett County does or does not possess with respect to the assignment of certain records technicians in cases prosecuted by the DA and Solicitor. However, Plaintiffs' evidence, if construed in her favor, raises a reasonable inference that the Gwinnett County Police Department has the necessary authority and control to organize its Property and Evidence Unit's functioning to ensure that its current full-time employees perform all chain of custody testimonial duties required based on the department's prior collection and storage of property. A reasonable jury thus could find that GCPD's offloading of its testimonial function and duties to Plaintiff under the circumstances presented amounts to "suffering or permitting" Plaintiff to work many hours that fall within the Police Department's power to perform itself. And in turn, a reasonable jury could find that the Gwinnett County Police Department has obtained cost savings in the labor of its evidence technicians by allowing Plaintiff to absorb the responsibilities and work (without wage payment) that a jury might reasonably find should have been or could be performed in-house by the GCPD. Of course, a reasonable jury might find the opposite as well.

## IV. CONCLUSION

Accordingly, as there exists a material dispute of fact, the Court **DENIES** Plaintiff's Motion for Summary Judgment [Doc.

---

appears to be based entirely on hearsay rather than her own personal experience.

34] and Defendant's Motion for Summary Judgment [Doc. 37].

This case is **REFERRED** for mediation to the next available Magistrate Judge. The Parties are **ORDERED** to participate in the mediation, to be completed within 45 days. Defendant is **DIRECTED** to consult with representatives of the District Attorney's and Solicitor's offices in advance of the mediation and make good faith efforts to request and arrange for these representatives to participate in the mediation.[8] In the event a settlement is not reached, the Parties **SHALL** file their proposed consolidated pretrial order within 20 days of the completion of the mediation. Once the pretrial order is submitted, this Case will be placed on the next available trial calendar.

**IT IS SO ORDERED** this 31st day of August, 2016.

8. The Magistrate Judge assigned to the case for the mediation should address this issue with the parties in advance of the scheduled mediation.